**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ERICA L. MCGAUGHEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-3804 |
| | § | |
| SBC COMMUNICATIONS, *et al.*, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Erica L. McGaughey sued her employer, Southwestern Bell Telephone ("SWBT"), alleging that she was demoted from a supervisory position because of race discrimination and retaliation for her prior complaints of discrimination. McGaughey alleges violations of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and asserts a claim for intentional infliction of emotional distress under Texas law. After discovery, SWBT moved for summary judgment on all of McGaughey's claims. (Docket Entry No. 23). McGaughey has responded, (Docket Entry No. 26), and SWBT has replied, (Docket Entry No. 28). SWBT has also moved to strike the expert testimony of Dr. Cyrus Sajadi, who opined that McGaughey suffers from posttraumatic stress disorder as a result of "circumstances surrounding her employment," including her demotion and personality conflicts with coworkers. (Docket Entry No. 24). McGaughey has responded, (Docket Entry No. 25), and SWBT has replied, (Docket Entry No. 27).

Based on the pleadings; the motions, responses, and replies; the parties' submissions;

and the applicable law, this court grants SWBT's motion for summary judgment and, by separate order, enters final judgment dismissing this case.  The motion to strike is denied as moot.  The reasons for these decisions are explained below.

## I.     Background

McGaughey, who is African-American, began to work at SWBT on July 25, 2001. (Docket Entry No. 9 at ¶ 4.1).  SWBT hired her as an Internet Data Center Sales Consultant to work at its Bellaire, Texas office.  (*Id.*).  In December 2001, her supervisor, John Kirby, a regional vice-president, promoted McGaughey to the position of sales manager for Long Distance Specialists.  (Docket Entry No. 23, Ex. A at 53).  In her new position, McGaughey managed a team of employees, which grew from four employees in December 2001 to between eight and ten employees in early 2002.  (*Id.* at 55–56).  In 2003, McGaughey became a sales manager for Network Sales Consultants, which she believes was a promotion. In late 2003 or early 2004, the sales division was reorganized, and McGaughey was promoted to the position of Technical Sales Manager, supervising approximately eight Technical Sales Executives.  (*Id.* at 89–90).  McGaughey was transferred to a nonsupervisory position in July 2004.

McGaughey's two-and-one-half-year tenure as a supervisor was not easy.  During that period, four of the members of one team that she supervised filed complaints alleging reverse race discrimination.  Two of those complaints resulted in state-court lawsuits.  (Docket Entry No. 26 at 4).  McGaughey filed  complaints about her subordinates and fellow managers, alleging that they made offensive racial comments.  In 2004, some of the members of

McGaughey's team asked to leave her group, including two African-Americans.  In July 2004, Kirby, who had earlier promoted McGaughey to supervisory positions, transferred her to a position in which she would have no supervisory duties.  This litigation followed.

The evidence as to the complaints filed by and against McGaughey is detailed in the summary judgment record.  In April 2002, Joanna Bolton, one of McGaughey's team members, complained to SWBT's human resources department that McGaughey treated her rudely and gave more favorable treatment to black employees than to white employees. (Docket Entry No. 23, Ex. D-2).  On June 21, 2002, Bolton filed an EEOC complaint in which she alleged that McGaughey discriminated against her because of her race (Causcasian) and retaliated against her for complaining.  (Docket Entry No. 23, Ex. E).

In May 2002, Jere Luck, another member of McGaughey's team, complained to SWBT's EEO department about the tone and content of emails McGaughey sent to the sales team she supervised.  Luck stated that the emails "drag[ged] me down emotionally," that McGaughey's demands were "extremely disrespectful of each of us and our schedules," and that it was "very difficult to be productive in this environment."  (Docket Entry No. 23, Ex. D-3).  In August 2003, after Luck was terminated for inflating her mileage reimbursement requests, she filed an EEOC charge alleging reverse discrimination.  (Docket Entry No. 23, Ex. F).

On June 25, 2002, Lauren Grossbard, another one of McGaughey's subordinates who had worked at the company for ten years, filed a complaint with SWBT's EEO department, alleging that McGaughey had unfairly evaluated her and improperly placed her on a

performance improvement plan despite excellent sales results.  Grossbard stated that she felt "discriminated against because of [her] age, race and employment benefits costs to the Company."  (Docket Entry No. 23, Ex. D-4).  Grossbard filed two EEOC complaints and a state-court lawsuit against SWBT.  (Docket Entry No. 23 at 4; Docket Entry No. 23, Ex. G).  In the lawsuit, Grossbard alleged that she "was treated differently by Ms. McGaughey as compared to Ms. McGaughey's treatment of African-American employees."  (Docket Entry No. 23, Ex. G at ¶ 26).

On May 25, 2002, Tanya Hudkins complained to John Kirby about McGaughey's work as a manager:

> I feel I have not been explained the job description in a correct or fair manner from Erika.  I do not feel comfortable with going to her or anything, she has told me she could care less if I like her or not, thrown my papers to the side, and walked out of a meeting with three other people and myself because of me wanting her to explain something.  I have seen many people crying on our team after being in meetings with Erika.  I do at least once a week.

(Docket Entry No. 23, Ex. D-5).

During this same period, McGaughey was filing complaints with SWBT's EEO department about team members she supervised.  In February 2002, McGaughey complained to Kirby and Lula McGregor, a human resources department employee, that Tanya Hudkins called her "colored," (Docket Entry No. 26, Ex. A at 105–06; Docket Entry No. 23, Ex. A at 10).  In April 2002, McGaughey complained to Kirby, McGregor, Trisha O'Neal, who worked in the EEO department, and on SWBT's EEO hotline, that another employee, Greta Douglas, told McGaughey that Hudkins had said, in reference to McGaughey, "I'm really

getting sick and tired of this nigger, and I wish she would just go away." (Docket Entry No. 26, Ex. A at 114). McGaughey complained that Hudkins was insubordinate and was attempting to "entice" other employees to be insubordinate. (Docket Entry No. 23, Ex. D-6). The record shows that the EEO department investigated the complaint and, although the allegation was neither substantiated nor discredited, counseled Hudkins and warned her that another complaint, if substantiated, could lead to disciplinary action up to dismissal. (Docket Entry No. 23, Ex. D-7).

In April 2002, human resources employees interviewed McGaughey's team members as part of an effort to improve the workplace relationships. Several members complained that McGaughey was difficult to approach and that they feared retaliation if they complained. Others complained about McGaughey's "mean and threatening" communications and that she "yells in meetings." Yet others agreed that some of the team members showed a lack of respect for McGaughey. (Docket Entry No. 23, Ex. D-8). Kirby asked all the sales managers, including McGaughey, to take courses on improving their management skills. (Docket Entry No. 23, Ex. D-9). Kirby also held a diversity meeting with the team to emphasize the need for good working relationships. (Docket Entry No. 23, Ex. C, Kirby Affid. at ¶ 4).

In July 2002, McGaughey complained about rude behavior from a number of people in the Bellaire office, alleging that the behavior was in retaliation for McGaughey's complaint about Hudkins. In August 2002, Hudkins was fired for altering a date on an SWBT document. She later filed a lawsuit in state court, alleging that McGaughey had

discriminated against her on the basis of her race and had retaliated against her.  In the same month, McGaughey filed a complaint with the company's EEO department, alleging that Karen Malik, a SWBT employee who was also Hudkins's mother, was spreading rumors about McGaughey.  The record shows that the EEO department investigated and concluded that although McGaughey's complaint could not be substantiated, in August 2002, Walsh – a senior vice-president – and Kirby held another diversity meeting to promote good workplace relationships.  (Docket Entry No. 23, Ex. D-12).

In January 2003, McGaughey became a sales manager for Network Sales Consultants. Complaints about, and by, McGaughey continued through 2003, with McGaughey complaining about offensive racial comments by other managers and on one occasion an employee who reported to a different manager.  In February 2003, McGaughey complained to Sharla Gordon, the senior human resources manager, that Jennifer Cummings, another manager, told her that an African-American employee on Cummings's team was a "tar baby."  (Docket Entry No. 26, Ex. A at 126).  SWBT notes that McGaughey made this accusation after Cummings complained to Sharla Gordon that McGaughey had made racial comments.  (Docket Entry No. 23, Ex. D-13).  In July 2003, McGaughey complained to Brian Dickinson, McGaughey's supervisor at the time, and to Kirby that another employee had seen a complaint filed by yet another employee about W.P. Latham, another manager, asserting that he had used the phrase "'super nigger' or 'head nigger in charge' or something of that nature." (Docket Entry No. 26, Ex. A at 136).  In August 2003, McGaughey complained to Lula McGregor and Mike Osborne, a representative in the asset protection

department, that another employee, Valerie Taylor – who is African-American – told her that Lanette Lange, another employee, commented to Taylor, "You need to go down there and get your sister [McGaughey] before I have to go whip her ass." (*Id.* at 141).  McGaughey was offended by Lange's reference to her as Taylor's "sister." (*Id.* at 143).  Managers complained about McGaughey as well.

The record shows that when McGaughey made complaints, the EEO department investigated.  On one occasion, the manager identified as making an offensive comment was removed from his supervisory position, but he resigned before the change became effective.  On another occasion, the employee was counseled.  McGaughey herself was counseled about comments she had made to another manager that led to a complaint.  (Docket Entry No. 23, Exs. D-13, 14; Docket Entry No. 23, Ex. C, Kirby Affid. at ¶ 6).  Although McGaughey argues that Kirby and the EEO department did not act on complaints she made, the record simply does not support her argument.

At the end of 2003, McGaughey's position changed in a reorganization of the sales division.  She became a Technical Sales Manager supervising eight "Technical Sales Executives."  Kirby, who had not been McGaughey's direct supervisor for the prior eighteen months, resumed that position.  Kirby testified that beginning in early 2004, several members of McGaughey's new team "complained that she was an ineffective manager, partly because she lacked technical expertise.  Several members of her team also complained to me that McGaughey's management style was dictatorial and disrespectful, among other things." (Docket Entry No. 23, Ex. C at ¶ 9).  Kirby stated that he "also received complaints about

McGaughey from her peers in the Bellaire office.  For example, Annette Nunis, an account manager and one of McGaughey's peers, complained that McGaughey lacked the technical knowledge necessary to function as a TSM.  (*Id.*).  Kirby stated in his affidavit:

> Several members of McGaughey's team left or threatened to leave in 2004. I allowed William Traylor to transfer to a newly-created position around April 2004 after he requested to transfer out of McGaughey's group.  In July 2004, Randy Blaylock left SWBT.  Blaylock informed me that McGaughey's abusive management style and technical ineffectiveness were two of the reasons for leaving.  Other employees also left McGaughey's team and one other left the company.  In response to these departures, McGaughey added only two new employees to her team, Jennifer Flowers and Pramahd Abraham. At various times, McGaughey's team had only five employees.

(*Id.* at ¶ 11).

McGaughey contends that these employees complained about her because they did not want to be "supervised by a black employee."  (Docket Entry No. 26 at 4).  In January 2004, McGaughey filed a complaint with the EEO department stating that she had heard that one of her team members told a joke with a racial term (she did not hear the joke) and that another team member made inappropriate racial comments.  The EEO department investigated.  The record shows that both of the employees McGaughey identified were counseled and the team was required to take a diversity training session.  (*Id*. at ¶ 10; Docket Entry No. 23, Exs. D-19, 20).

In January 2004, McGaughey complained to Kirby, Dickenson, and Rebecca Delgadillo that one of McGaughey's team members reported to her that another team member, Stuart Henderson, had been "telling quote/unquote 'colored jokes.'" (Docket Entry

No. 23, Ex. A at 144).  McGaughey did not hear the joke.  (*Id.* at 144–45).  McGaughey

reported in her deposition the following exchange with Henderson:

> So I spoke to Stuart [Henderson].  And within a couple of seconds of us having
> a conversation, I just let him know that, "I wanted to explain to you that I was
> informed that you have been telling some jokes in the office that some people
> are finding offensive."
>
> And he stopped me and said, "I know exactly what you're talking about.  And
> you people just need to figure out what you want to be called because a few
> years ago it was okay to call you people colored."

(*Id.* at 146).  At the same time, McGaughey complained about an interaction she had with

Randy Blalock.  McGaughey testified in her deposition, as follows:

> Q.    . . . .
>
>       What about Mr. Blalock?  What was your complaint about him?
>
> A.    That we were having a staff meeting, and we were going to be in on a
>       Monday morning, January the 19th, for the staff meeting.  And during
>       the meeting Mr. Blalock looked at me and said, "Are you going to work
>       on that day?"
>
>       And I stated, "I'm not really sure I understand what you're saying.
>       Yes, I'll be here on a Monday as I typically am on Mondays."
>
>       And he said, "Oh, okay.  Well, I just wondered because I thought all
>       you people took off on Martin Luther King Day."

(*Id.* at 148–49).  McGaughey also alleges that she complained to Trisha O'Neal and

Elizabeth Ferrell, who worked in the EEO department, about the reaction in the office to her

complaints.  McGaughey testified in her deposition:

> Q.    So, I'm trying to understand what your exact complaint was.  Was your
>       complaint that you made these allegations and people against whom
>       you made the allegations were talking about it?

A.      Yes.

Q.      In the office?

A.      Yes.

Q.      Okay.  And is that the complaint that you made to Ms. O'Neal and Ms.
        Ferrell?

A.      Yes.   And that what it was doing was causing a hostile work
        environment; that needless to say, individuals who were not minorities,
        specifically Caucasian or white people who these individuals were
        discussing it with, were being hostile towards me due to what was
        being discussed and what these individuals were telling them.  They
        were telling them a slanted story.  They were telling them – basically
        defaming my character, and they were lying.

(*Id.* at 151–52).  McGaughey further testified that she told Ferrell:

        That [she] was basically under a lot of stress and feeling as if
        [she] was in a hostile work environment, the individuals were
        treating [her] differently, that people were being very belligerent
        with [her].  They were – if they had the opportunity to let [her]
        know in no uncertain terms that they . . . didn't like [her] or for
        – for whatever reasons and tie it back to what Tanya Hudkins
        had said or Lauren Grossbard or Jere Luck, then they were
        doing that, and that [she] just felt like [she] wasn't being treated
        fairly based upon all of the lies that were being told.

(*Id.* at 153).

The evidence is conflicting as to whether Kirby attempted to help McGaughey

understand her management problems and improve them.  Kirby testified that he talked to

McGaughey about the need for a better team environment on repeated occasions from

December 2003 through May 2004.  (Docket Entry No. 23, Ex. C at ¶ 12).  McGaughey

disputes that she received counseling or advice on improving her managerial skills.

It is undisputed that in July 2004, Kirby decided to move McGaughey to a nonsupervisory position. (Docket Entry No. 26 at 4; Docket Entry No. 9 at ¶ 4.1). Kirby met with McGaughey and offered her three alternative positions. She accepted the position of senior project manager, which involves no supervision of other employees. (Docket Entry No. 26 at 4). McGaughey alleges that the transfer was a demotion and that although her base pay increased, her total pay, including commissions, was higher as a sales manager. (*Id.*) She alleges that Kirby told her that she was being demoted. (Docket Entry No. 26, Ex. A at 272). SWBT assumes, for the purpose of the summary judgment motion, that the change was a demotion.

Kirby testified in his affidavit that he moved McGaughey to a nonsupervisory position because of the complaints from her team members. (Docket Entry No. 23, Ex. C at ¶¶ 12–14). In response to McGaughey's July 2004 request for a written explanation of her transfer, Kirby identified the following reasons:

- Four of ten employees reporting to you have filed EEOC complaints charging you with discrimination and retaliation;

- We are currently defending two lawsuits where former female Caucasian employees who reported to you accused you of racial discrimination and retaliation;

- At least two employees have resigned because of complaints about your management style; and

- Several employees have raised general complaints about your management style. Most of the complaints mirror each other; your subordinates believe you are disrespectful and you treat them badly.

(Docket Entry No. 23, Ex. D-22). Kirby replaced McGaughey with Michael Collins, who

is African-American.  (Docket Entry No. 23, Ex. C at ¶ 14).

McGaughey disputes that she was moved as a result of her subordinates' complaints about her.  (Docket Entry No. 26 at 8–9).  She contends that the reason given was pretextual and that she was demoted because of her race and in retaliation for complaints she had made about racial discrimination at SWBT.  (*Id.*)

SWBT's motion for summary judgment is analyzed as to each of the three causes of action that McGaughey asserts.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate the evidence in the record insufficiently supports an essential element or claim.  *Celotex*, 477 U.S. at 330.  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir.

2005).  "An issue is material if its resolution could affect the outcome of the action."  *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.  "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.    The Race Discrimination Claim

A.      The Applicable Law

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). "Claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n.2 (5th Cir. 1996).

When a plaintiff attempts to prove allegations of discrimination and retaliation through indirect or circumstantial evidence, the claims are considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* approach, the plaintiff has the initial burden of making a *prima facie* showing of race discrimination. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881 (5th Cir. 2003). A plaintiff satisfies this burden by showing that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action was due to her membership in the protected class. *Frank v. Xerox Corp.*, 347 F.3d 130, 137 (5th Cir. 2003); *Okoye v. Univ. of Tex. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001); *see also Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005) ("To establish a *prima facie* case of discrimination under § 1981, Appellants must establish that the: (1) are members of a protected group; (2) were qualified for the position held; (3) were discharged from the position; and (4) were replaced by persons outside of the protected group."). The fourth prong may also be met if a plaintiff shows that

she was "treated differently from others similarly situated." *Abarca v. Metropolitan Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005).

If a plaintiff makes a *prima facie* showing of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory explanation for its decision. *See Manning*, 332 F.3d at 881. If the defendant meets this burden, the burden shifts back to the plaintiff to show that the defendant's reason was a pretext for discrimination. *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001).

The Supreme Court has held that a "plaintiff's *prima facie* case, combined with sufficient direct evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). The trier of fact may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id*. at 147; *see also Vade v. Mississippi State University*, 218 F.3d 365, 374 n.23 (5th Cir. 2000) (discussing application of *Reeves*). This showing, coupled with a *prima facie* case, may permit the trier of fact to conclude that the employer discriminated against the plaintiff without additional evidence. *Reeves*, 530 U.S. at 148. However, such a showing will not always be enough to prevent summary judgment. There may be cases in which a plaintiff has both established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, yet "no rational factfinder could conclude that the action was discriminatory." *Id*. Whether summary judgment is appropriate depends on numerous factors, including "the strength of the plaintiff's prima facie case, the probative value of the

proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Id*. at 148–49.  "At all times, the plaintiff retains the ultimate burden of persuasion.  *See Burdine*, 450 U.S. at 253.

A modified *McDonnell Douglas* approach applies to cases in which a plaintiff alleges an adverse employment action partially motivated by racial animus (mixed-motive cases).  *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  After the plaintiff has met her *prima facie* case and the defendant has responded with a legitimate nondiscriminatory reason for the adverse employment action, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either:  (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive alternative). *Keelan v. Majesco Software, Inc*., 407 F.3d 332, 341 (5th Cir. 2005) (internal quotation marks omitted; second alteration in original); *see also Rachid*, 376 F.3d at 312.  If the plaintiff can meet the mixed-motives standard, it then falls to the defendant to prove that the same adverse employment decision would have been made regardless of discriminatory animus. If the employer fails to carry this burden, the plaintiff prevails.  *Keelan*, 407 F.3d at 341.

### B.    Analysis

Although the *prima facie* burden is low, McGaughey's evidence is weak.  When McGaughey was demoted, the management position she had occupied was assigned to

another African-American employee.  (Docket Entry No. 23, Ex. C at ¶ 14).  Courts have found that when a position is filled by someone in the protected class, a *prima facie* case of race discrimination is not shown.  *See Wheeler*, 415 F.3d at 399.  Even disregarding this basis for decision and taking into account McGaughey's belated recollection during her deposition that the reason  an African-American employee was chosen to replace her was to avoid an appearance of discrimination, McGaughey has not presented any evidence that other, similarly situated employees outside the protected class were treated more favorably.  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir.2001).  There is no evidence as to different treatment for supervisors who had been the subject of complaints by both subordinates (on different teams) and coworkers.  Nor is there evidence as to different treatment for a supervisor who had suffered the defection of a number of team members.  *O'Brien v. Lucas Assocs. Personnel, Inc.*, 127 Fed. Appx. 702, at * 4 (5th Cir. April 5, 2005) (female employee demoted from her managing partner position failed to show that she was treated differently from male managing partners who had similar turnover rates because she failed to show that they had similar patterns of employee complaints against them).  When asked, in her deposition, to identify another manager who had had four EEOC complaints filed against them, McGaughey was unable to name one.  (Docket Entry No. 23, Ex. B at 245).

Applying the full *McDonnell Douglas* analysis does not allow McGaughey to avoid summary judgment on her race discrimination claim.  SWBT has produced a legitimate, nondiscriminatory reason for its employment decision:  that McGaughey was moved to a

nonsupervisory position because of an extended period of employee complaints about her management ability, occurring on different teams, and because of turnover on her teams. *See Reeves*, 530 U.S. at 142 ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'").  SWBT provided competent summary judgment evidence, including affidavits and supporting documents that detail the problems employees had with McGaughey's management style.  The evidence shows that the problems McGaughey had occurred on two separate teams, the long distance specialist and network sales consultant team that she supervised beginning in late 2001, and the technical sales executives team that she supervised beginning in late 2003.  McGaughey was the subject of a number of complaints charging reverse discrimination and retaliation, including two lawsuits.  Shortly before she was reassigned, several employees in her team had left, citing her performance as manager as the reason.

McGaughey argues that the complaints about her are hearsay because they "all came from employees of Defendant."  (Docket Entry No. 26 at 11).  SWBT, however, offers evidence of these complaints to show its understanding of McGaughey's conduct.  The testimony is not offered for the truth of the matter asserted – to show McGaughey's behavior as a manager – but as evidence of the information Kirby had when he transferred her to a nonsupervisory position.  *See Lindsey v. Prive Corp.*, 161 F.3d 886, 895 (5th Cir. 1998).

McGaughey complained about racially insensitive and offensive remarks by team members, as well as fellow managers and employees who reported to other managers, but this evidence does not raise a "jury issue as to the employer's discriminatory animus or the

falsity of the employer's legitimate nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).  McGaughey does not dispute that her peers and subordinates complained about different aspects of her management style.  She does not dispute that her employees not only complained but also filed lawsuits and sought transfers to other positions in the company to avoid her as a supervisor.  Although she argues that their complaints were racially motivated, she did not assert that the individual who made the decision to reassign her, and those with whom he consulted, were racially biased against her.  Kirby made the decision to transfer her to a nonsupervisory position after two and one-half years of complaints about her work as a manager.  Kirby had promoted McGaughey in the first place and had given her a second promotion when the department was reorganized in 2003.  (Docket Entry No. 26 at 4).  These circumstances create "an inference that discrimination was not the employer's motive in terminating the employee." *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 n.3 (5th Cir. 1997) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)); *see also Morrison v. Weyerhaeuser Co.*, 119 Fed. Appx. 581, 586 (5th Cir. 2004) ("Where the same person is responsible for hiring and discharging an individual, there is an inference that [a discriminatory motive] was not the reason for the discharge."); *Cartagena v. Aegis Mortgage Corp.*, 275 F.3d 46, at *2 (5th Cir. 2001) ("From the stand point of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.") (internal quotations omitted).

Although McGaughey asserts that evidence of discrimination can be gleaned from

Kirby's knowledge of her numerous complaints about other employees and supervisors and his failure to do anything, the record contradicts her assertion. The record shows evidence, that McGaughey has not controverted, that employees she identified as making racially offensive comments were counseled, were given training, or were disciplined – including being removed from a supervisory position – even when McGaughey's accusations could not be substantiated or discredited. Evidence of racially offensive comments made by others, who had no involvement in the employment decisions at issue does not raise a fact issue as to whether Kirby or any relevant decisionmaker acted out of racial animus. "Stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v. Slater*, 181 F.3d 703, 712 (5th Cir. 1999); *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 346 (5th Cir. 2005); *Moore v. United Parcel Service, Inc.*, 150 Fed. Appx. 315, 318 (5th Cir. 2005). Moreover, the evidence shows that McGaughey was not only criticized for poor management skills and ability by Caucasian employees, but also by African-American members of the team. Both Marques Holmes and William Traylow asked to transfer out of McGaughey's group in 2004 because of her managerial style. (Docket Entry No. 23, Ex. C, Kirby Affid. at ¶ 11; Docket Entry No. 23, Exs. D-16, D-18).

McGaughey has not raised a fact issue that the reasons for her reassignment were false or that racial discrimination was a motivating factor in the decision to move her to a nonsupervisory role. *See Myers v. Crestone Intern., LLC*, 121 Fed. Appx. 25, at *2–3 (5th Cir. Jan. 14, 2005) (holding that, despite suspicious timing, an employee who failed to show

the falsity of the employer's legitimate nondiscriminatory explanation for the employment action or discriminatory animus by the decision maker, could not survive summary judgment).  SWBT's motion for summary judgment is granted as to McGaughey's claims for racial discrimination and retaliation.

## IV.    The Retaliation Claim

### A.    The Legal Standard

To establish a *prima facie* case of retaliation under either Title VII or section 1981, a plaintiff must show that:  "(1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  If a plaintiff makes a *prima facie* case, the burden shifts to the defendant to proffer a legitimate rationale for the underlying employment action.  *Id.*  If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation.  *Id.*

The *McDonnell Douglas* framework applies to Title VII retaliation claims brought under a pretext theory.  Under that framework, the employee's ultimate burden is to prove that the employer's stated reason for the adverse action was merely a pretext for the real, retaliatory purpose.  The proper standard of proof on the causation element of a Title VII retaliation claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct.  *Septimus v. Univ. of Houston*, 399 F.3d 601 (5th Cir. 2005);  *Pineda v. United Parcel Service, Inc*., 360 F.3d 483, 487 (5th Cir. 2004).

### B.     Analysis

McGaughey relies heavily on the timing between her complaints about racial discrimination and her reassignment.  (Docket Entry No. 26 at 16).  "[T]he combination of suspicious timing with other significant evidence of pretext [] can be sufficient to survive summary judgment."  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (*quoted in Myers*, 121 Fed. Appx. 25).  McGaughey began complaining about racially offensive comments made by subordinates and fellow managers in February 2002.  (Docket Entry No. 23, Ex. B at 9).  McGaughey made additional complaints in 2003.  Even after these complaints, in late 2003, Kirby assigned McGaughey to another supervisory position in a reorganization of the sales division.  In short, after McGaughey had made a number of complaints, she received what she considered a promotion.

In January 2004, McGaughey complained to the EEO department about offensive racial comments by two members of her team.  The decision to move McGaughey to a nonsupervisory position was made in July 2004.  During the period from January to July 2004, McGaughey's team members continued to complain about her.  Four members sought transfer, leaving the team short-handed.  (Docket Entry No. 23, Ex. C at ¶ 11).  McGaughey's reassignment did not occur until July 21, 2004, more than seven months after her last complaint of discrimination.

"[W]hile timing can sometimes be a relevant factor in determining whether a causal connection exists where the timing between a protected activity and an adverse employment action is suspiciously proximate, the contrapositive inference does not necessarily follow."

*Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 417 n.9 (5th Cir. 2003).  McGaughey has

introduced neither suspicious timing between the allegedly protected activity and the

termination nor other evidence that would permit an inference of causation.  *See Raggs v.*

*Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (affirming award of

summary judgment to the employer because the plaintiff produced no evidence to support

an inference of causation beyond the fact that the employer terminated the plaintiff five

months after the plaintiff engaged in protected activity); *Shackelford*, 190 F.3d at 408–10

(holding that a fact issue existed as to causation based on evidence that the employee, after

receiving positive evaluations for four years, received a negative evaluation of dubious

distinction on the same day in which she engaged in protected activity, and in which the

record contained numerous statements from other employees that the plaintiff's job would

be in jeopardy if she engaged in protected activity); *Swanson v. Gen. Servs. Admin.*, 110 F.3d

1180, 1188 n.3 (5th Cir. 1997) ("[T]he mere fact that some adverse action is taken *after* an

employee engaged in some protected activity will not *always* be enough for a *prima facie*

case.") (emphasis in original).  SWBT has proffered a legitimate nondiscriminatory reason

for the decision to reassign McGaughey.  McGaughey has not raised a fact issue as to the

causal connection between her complaints and her reassignment.  Summary judgment on the

retaliation claim is granted.

## V.    The Hostile Work Environment Claim

McGaughey argues in her summary judgment response that the alleged discrimination

resulted in a hostile work environment.  "When the workplace is permeated with

discriminatory intimidation, ridicule, and insult that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  In order for conduct to be sufficiently "severe or pervasive" to create such an "abusive working environment," it must create an environment that a reasonable person would find hostile or abusive.  *See Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Harris-Childs v. Medco Health Solutions, Inc.*, 2006 WL 616022, at *4 (5th Cir. March 13, 2006).  In making such a determination, courts consider factors such as the frequency of the conduct, its severity, and the degree to which it unreasonably interferes with an employee's work performance.

McGaughey relies on evidence of her complaints of racially offensive comments about her in the workplace, the results of the investigations into those complaints, and an asserted lack of response by Kirby and SWBT, to support her assertion of a hostile work environment.  McGaughey was the first black supervisor employed by John Kirby in the sales area.  She asserts that a fellow employee used the word "colored"; a white employee referred to her as a "nigger"; a white employee used the word "tar baby"; an employee referred to her as a "Super-nigger"; a white employee threatened to "whip Plaintiff's ass"; a white employee told a "colored joke"; and a white employee spoke negatively about Martin Luther King Day.  (Docket Entry No. 26 at 2–3).

The evidence McGaughey presents, taken in the light most favorable to her, does not raise a fact issue as to a hostile work environment.  Title VII "was only meant to bar conduct

that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace."  Conduct that "sporadically wounds or offends but does not hinder [an] employee's performance" is not actionable.  *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996); *see also Shepard v. Comptroller Public of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).  It is a "demanding" standard that requires proof of severe or pervasive conduct that can be characterized as "extreme."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The record before this court does not approach the necessary showing.  *See, e.g.*, *Valecillo v. U.S. Dept. of Housing & Urban Development*, 155 Fed. Appx. 764, 765 (5th Cir. 2005) (holding that two racially offensive statements by an employee's supervisors were not sufficiently severe or pervasive to constitute a hostile work environment and affirming district court's award of summary judgment for employer); *Williams v. U.S. Dept. of Navy*, 149 Fed. Appx. 264, 269 (5th Cir. 2005) (affirming district court's holding that three harassing incidents was insufficient to establish a *prima facie* case of hostile work environment); *Pickens v. Shell Tech. Ventures Inc.*, 118 Fed. Appx. 842, 850 (5th Cir. 2004) (affirming employer's summary judgment award and holding that racially insensitive comments were not sufficiently pervasive or abusive to create a hostile work environment).  Summary judgment on this claim is granted.

## VI.    The Intentional Infliction of Emotional Distress Claim

McGaughey alleges a state-law claim of intentional infliction of emotional distress by SWBT.  (Docket Entry No. 9 at ¶¶ 5.1–5.2).  In *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir. 1991), the Fifth Circuit set out in detail the elements of a claim for intentional

infliction of emotional distress under Texas law.  First, a plaintiff must show that the defendant acted intentionally or recklessly.  Second, she must show that the defendant's conduct was "extreme and outrageous," "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious." *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d).  "[T]he level of atrociousness to which [the behavior] must [rise] is quite high.  Simply put, it must exceed all possible bounds of decency and be utterly intolerable in a civilized society."  *Franklin v. Ensearch, Inc.*, 961 S.W.2d 704, 710 (Tex. App. – Amarillo 1998, n.w.h.).  Third and fourth, the plaintiff must show that the actions of the defendant caused the plaintiff to suffer emotional distress and that the distress was severe. *See Wilson*, 939 F.2d at 1142; *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993).[1] There is no litmus test for outrageousness; whether conduct was outrageous and extreme must be analyzed on a case-by-case basis.

McGaughey alleges, as previously described, that various employees made racially hostile and insensitive remarks.  (Docket Entry No. 23, Ex. B. at 9–10).  McGaughey also alleges that she complained to her supervisors about these comments and that SWBT failed to respond to her complaints.  (*Id.*).  Texas courts refuse to "recognize intentional infliction of emotional distress claims for 'ordinary employment disputes,' emphasizing that extreme

---

[1]SWBT moves to strike the expert testimony of Dr. Cyrus Sajadi, (Docket Entry No. 24), who seeks to testify that McGaughey suffered from posttraumatic stress disorder as a result of her experiences with SWBT.  Because this court grants summary judgment as to McGaughey's claims, including her claim for intentional infliction of emotional distress, SWBT's motion is moot.

conduct in this context 'exists only in the most unusual of circumstances.'" *Tex. Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 611 (Tex. 2002) (quoting *GTE Sw, Inc. v. Bruce*, 998 S.W.2d 605, 612–13 (Tex. 1999)).  The record does not approach the threshold needed to create a triable issue of fact as to whether SWBT's conduct exceeded "all possible bounds of decency" or was "utterly intolerable in a civilized society." *Franklin*, 961 S.W.2d at 710.  SWBT's motion for summary judgment as to McGaughey's intentional infliction of emotional distress claim is granted.

## VII.  Conclusion

SWBT's motion for summary judgment is granted.  Final judgment is entered by separate order.

SIGNED on June 14, 2006, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge